UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL KUCHMEK,<br><br>Plaintiff,<br><br>v.<br><br>MARAT TSIRELSON; IGOR SHRAYEV IREIT, LLC, a Florida limited liability company, d/b/a LOAN SERVICE SYSTEMS, d/b/a AMEX CARD PROCESSING SERVICES, d/b/a AMEX CARD PROCESSING, IREIT, INC.; GM HOME, INC., d/b/a GM REALTY; and GMA Realty Network, Inc.,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff, Michael Kuchmek, ("Plaintiff" or "Kuchmek"), for his complaint against Marat Tsirelson, Igor Shrayev, IREIT, LLC, IREIT, Inc., GM Home, Inc. and GMA Realty Network, Inc. (collectively, "Defendants") alleges, upon personal knowledge as to itself and upon information and belief as to other matters, as follows:

**Preliminary Statement**

1. The crux of this case concerns a lender-borrower relationship between Plaintiff and Defendants whereby Defendants borrowed significant sums of money – nearly $4 million – to be used for the purchase, rehabilitation and resale of homes located in Florida and Pennsylvania, primarily in the City of Philadelphia. Defendants have failed to pay back the principal and interest now due to Plaintiff and have made no payments toward the outstanding amounts for over 5 months.

2. In addition, throughout the course of the lending relationship, Defendants made significant misrepresentations or omissions of material fact as to the nature and status of their business in order to induce Plaintiff into continuing to loan them more money, to renegotiate the terms of the loan agreement, to induce Plaintiff into forbearing to call all principal amounts owed, and to avoid paying Plaintiff all sums due and owing.

3. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in excess of $1,800,000.00 as set forth more fully below.

### Jurisdiction and Venue

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(1).

### The Parties

6. Plaintiff Michael Kuchmek is a citizen and resident of the State of Connecticut with an address of 1 Harbor Point Road, Unit 854, Stamford, CT 06902.

7. Defendant Marat Tsirelson ("Tsirelson") is a citizen and resident of the Commonwealth of Pennsylvania with an address of 68 Dorchester Lane, Richboro, PA 18954.

8. Defendant Igor Shrayev ("Shrayev") is a citizen and resident of the State of Florida with an address of 1937 Harrison Street, Hollywood, FL 33020.

9. Defendant IREIT, LLC is a Florida limited liability company, with its corporate office and/or principal place of business located in the Commonwealth of Pennsylvania at 102 East Pennsylvania, Blvd., Feasterville, PA 19053.

10. IREIT, Inc. is a Florida corporation with its principal place of business located at 1946 Tyler Street 22, Hollywood, Florida, 33020.

11. Defendant GM Home, Inc. is a Pennsylvania corporation with its principal place of business located at 1111 Street Road, Suite 304, Southampton, PA 18966.

12. GMA Realty Network, Inc., is a Florida company with its principal place of business located at 1946 Tyler Street 22, Hollywood, Florida, 33020.

13. Defendants Tsirelson and Shrayev are members of IREIT, LLC.

14. Defendants Tsirelson and Shrayev are the principals and owners of IREIT, Inc.

15. Defendants Tsirelson and Shrayev are the principals and owners of GM Home, Inc.

16. Defendants Tsirelson and Shrayev are the principals and owners of GMA Realty Networking, Inc.

### The Lending Relationship of the Parties

17. In January of 2011, Plaintiff Kuchmek was approached by Defendant Tsirelson about providing bridge financing to IREIT, LLC, on an extremely short term basis, at most two weeks, and typically three days, in order to facilitate condominium sales in Miami, Florida.

18. Defendant IREIT, LLC would purchase properties that were in foreclosure or as a short sale approved by the bank and, through a realty office operated by GM Home, Inc., doing business at the time as GMA Realty Network, Inc. ("GMA Realty"), would quickly sell the property on the open market.  In most cases, GMA Realty at the time (as GM Home, Inc. was not created until 2016) already had a buyer lined up before

3

purchasing the property from the bank.

19. For providing the bridge financing, Plaintiff would receive two (2) to three (3) percent on the transaction amount. The loan amounts provided by Plaintiff to Defendants was done on a per transaction basis whereby Tsirelson would communicate directly with Plaintiff, describe the property, and how much was needed for the purchase.

20. Plaintiff would then send a wire transfer and within a short period of time, no more than two weeks, would receive a wire transfer back with the agreed upon interest amount. None of the transaction amounts exceeded $100,000.

21. This lender-borrower relationship existed from 2011 through 2013.

22. In 2014, the lending relationship between Plaintiff and Defendants expanded in both the amounts of the loans and the number of properties purchased.

23. Defendants effectively changed their business model whereby they would purchase properties that needed renovation and rehabilitation via short sale or through foreclosure in Florida and Pennsylvania, primarily in Philadelphia. The typical turn-around time between purchase, rehabilitation and sale of a property was three (3) months.

24. Given the longer timeframe between purchase and sale of the properties at issue, Defendants requested to forego consistently sending the principal amount back to Plaintiff after each transaction and instead proposed to roll over $1 million in principal each month and pay the two (2) percent interest per month with the principal capable of being "called" by Plaintiff. Plaintiff agreed and the parties' course of performance and lending relationship continued up through March/April 2016 when Defendants borrowed an additional $325,000 and were unable to repay Plaintiff this principal amount in a timely fashion. Notably, April 2016 Defendants also changed banks from JP Morgan to

Wells Fargo, claiming they had obtained better rates.

25. Over the course of the entire lender-borrower relationship between Plaintiff and Defendants, Plaintiff loaned Defendants $3,925,900.00. Defendants paid Plaintiff back the total sum of $2,660,564.56. Accordingly, Defendants owe Plaintiff $1,265,335.44 in principal, exclusive of the agreed upon interest amount.

## Wrongful Conduct

26. Unbeknownst to Plaintiff, Defendants had made false and material misrepresentations and omissions throughout the course of the lending relationship with full knowledge that they would be unable to repay Plaintiff the amounts owed while continuing to borrow money from Plaintiff.

27. Indeed, instead of advising Plaintiff of Defendants' financial condition, Defendants engaged in subterfuge designed to continue to extract monies from Plaintiff and used these funds for purposes undisclosed to Plaintiff while at the same time stripping all of the equity out of the purchased properties. Defendants' scheme would virtually ensure that there were no viable assets that could be used to repay Plaintiff the amounts owed.

28. More specifically, in late 2015 or early 2016, another investor who was never disclosed to Plaintiff filed an action against Defendants or their related entities seeking $1.5 million.

29. Upon information and belief, Defendants used the monies borrowed from Plaintiff that were intended for the purchase and rehabilitation of properties in Pennsylvania and Florida to fund their defense of the Florida action and the ultimate settlement of that case.

30. At no time did Defendants ever disclose the Florida action and what it entailed until well after they had already extracted as much money as they could from Plaintiff.

31. Further, rather than advising Plaintiff of these events, Defendant Tsirelson intentionally and in bad faith renegotiated the loan terms with Plaintiff with full knowledge that Defendants would be unable to meet their obligations even under the renegotiated loan terms.

32. On July 6, 2016, Defendant Tsirelson contacted Plaintiff and requested an extension and a fixed rate on the amount owed for 4-6 months. The purpose was allegedly to repay Plaintiff by the end of the year. Defendant Tsirelson represented that he had experienced a "capital crunch," but did not disclose that it resulted from a lawsuit by another investor. Instead, Tsirelson stated that the problem was caused by sales of properties failing to close because of inspection issues and buyers failing to qualify for financing.

33. On July 8, 2016, in an effort to entice Plaintiff to agree to new loan terms, Defendant Tsirelson falsely stated to Plaintiff that as of July 8, 2016 the current market value of all the properties owned by Defendants was $6.9 million and all debt outstanding was $3.7 million, thereby leaving ample equity with which to repay Plaintiff upon sale of the properties.

34. On July 10, 2016, Plaintiff spoke to Defendant Tsirelson via telephone and proposed a counteroffer whereby Defendants would pay $25,000 per month in interest and $8700 in interest totaling $33,700 per month. Tsirelson confirmed that the total amount owed to Plaintiff at the time was $1,685,000.00 and agreed to Plaintiff's

counteroffer.

35. On July 14, 2016, Defendant Tsirelson provided Plaintiff with a property list of the properties in Florida and Pennsylvania. In doing so, he materially misrepresented to Plaintiff there was an additional $1 million in equity in the properties even after paying back Plaintiff in full. Tsirelson also misrepresented to Plaintiff that other than the primary mortgage lender, Genesis Capital, there were no other investors like Plaintiff who had any interest in the properties at issue.

36. Thereafter, on August 31, 2016, Defendant Tsirelson claimed that Defendants had "solid assets hitting the market" and would be able to catch up on payments to Plaintiff as $500,000 was due to Plaintiff by October 2016. Nevertheless, Defendants missed payments in October 2016.

37. In November 2016, Tsirelson confirmed with Plaintiff that the amount owed was $1.78 million of principal and interest. Tsirelson claimed that property sales were tougher than he had anticipated but Defendants had "solid assets" that they could use to pay Plaintiff back. No payments have been made to Plaintiff since November 2016. Defendant Tsirelson tried to get Plaintiff to bring down rate from 24% and create a new payment plan again

38. On January 17, 2017, Defendant Tsirelson confirmed and acknowledged that the amount owed to Plaintiff as of that date was $1,848,183.00. Defendants made excuses for the lack of payments citing closing delays and loans falling through for buyers.

39. On Sunday, February 12, 2017, Defendant Tsirelson sent a list of 29 properties which would allegedly be used to repay Plaintiff.

40. On April 9, 2017, with Defendants being 5 months behind on any payments to Plaintiff, Plaintiff spoke to Tsirelson about one of the lots located in Florida. Tsirelson stated he was awaiting permits so he could sell it at $150,000 in profit and would return some funds to Plaintiff.

41. Plaintiff then requested that Defendants sell the property immediately at cost to which Tsirelson responded that he would do what he could but that it would be better if Plaintiff found another investor to take out his position. During the same time period, Defendant Shrayev provided Plaintiff with a list of the 32 properties that would be used to pay Plaintiff back along with a breakdown of all expenses. The addition of three properties raised questions for Plaintiff as Defendants advised no more properties had been purchased yet now additional properties materialized that could allegedly be used to pay back Plaintiff.

42. On Tuesday, April 11, 2017, Plaintiff asked if he could speak to the realtor about upcoming closings. Defendant Tsirelson rejected Plaintiff's request and advised Plaintiff that anything he needed would be provided by Defendants Tsirelson or Shrayev.

43. On Friday, April 14, 2017, Plaintiff was supposed to meet Defendant Shrayev at Defendants' Pennsylvania office to go through financials and obtain more information. Abruptly, Shrayev stated he could no longer do the meeting as he was traveling for family vacation, and Defendant Tsirelson was out of the country on a family vacation. Defendant Shrayev asked Plaintiff to send an email with all questions that would have been asked at the meeting and that he would discuss the question with Tsirelson and send an email to Plaintiff with answers to Plaintiff's questions.

44. Defendant Shrayev failed to do so and stated that he would not be sending any information, that it would be best if the parties met in person to discuss a repayment plan, and that Defendants had no intention of winding down the business and stop purchasing homes in order to pay Plaintiff back as they needed "ability to earn".

45. On May 2, 2017, Defendants Tsirelson and Shrayev traveled to New York to meet with Plaintiff. At that meeting, Plaintiff advised Defendants that he had engaged legal counsel and was going to conduct title searches on the properties.

46. For the first time, Defendants then advised Plaintiff that in 2015 they were sued by their largest investor in Florida and that any and all of the assets in Florida were frozen and that all operations in Florida had ceased after they lost the case on appeal (4 of the 32 properties stated as collateral were fully encumbered by the other lawsuit).

47. Then, despite Tsirelson's representation that none of the properties remaining had any additional investors after the first mortgages other than Plaintiff, Defendants advised Plaintiff for the first time that eight (8) of the properties located in Philadelphia were subject to joint venture agreements under which Defendants were only entitled to twenty (20) percent of the profits upon sale.

48. Defendants then advised Plaintiff that while enough equity existed in the 32 remaining properties to pay Plaintiff back, doing so would effectively put Defendants out of business. Accordingly, Defendants sought a new arrangement which included the audacious request that Plaintiff loan them additional funds.

49. Plaintiff, through his counsel, then made efforts to engage in good faith negotiations with Defendants to restructure the loan. During that process, Plaintiff learned via title searches that the thirty-two (32) properties allegedly available to pay

9

back Plaintiff had either already been sold or encumbered with all the equity being stripped out of them.

## Count I
## Breach of Contract

50. The foregoing paragraphs are incorporated herein as if set forth in full.

51. As set forth above and as evidenced by a course of performance from 2011 to 2016, Plaintiff has a loan agreement with Defendants pursuant to which Plaintiff loaned Defendants a total $3,925,900.00.

52. Defendants have materially breached the loan agreement by failing to pay Plaintiff all sums due and owing under the loan agreement.

53. Defendants' material breach of the loan agreement has directly and proximately caused Plaintiff damages in the amount of $1,848,183.00 of principal and interest, with interest continuing to accrue.

## Count II
## Unjust Enrichment

54. The foregoing paragraphs are incorporated herein as if set forth in full.

55. As set forth above, Plaintiff has bestowed a benefit upon Defendants by way of monies loaned. Defendants have retained such benefit valued at $1,848,183.00.

56. It would be unjust and inequitable for Defendants to retain the benefit conferred them by Plaintiff without compensation to Plaintiff for such benefit.

57. Accordingly, Defendants have directly and proximately caused Plaintiff to incur damages valued at $1,848,183.00.

## Count III
## Fraud

58. The foregoing paragraphs are incorporated herein as if set forth in full.

59. As set forth specifically above, Defendants made false representations to Plaintiff or omissions of material fact in order to induce Plaintiff to continue to loan Defendants funds, to induce Plaintiff not to call for immediate payment of the principal loan amounts despite his legal right to do so, to induce Plaintiff to renegotiate the loan terms, and to avoid paying Plaintiff sums due and owing.

60. Plaintiff reasonably relied on Defendants representations to his detriment.

61. As a direct and proximate cause of Defendants' unlawful and wrongful conduct Plaintiff has incurred damages in excess of $1.8 million.

## Count IV
## Conversion

62. The foregoing paragraphs are incorporated herein as if set forth in full.

63. Plaintiff had and continues to have a legal right, title, and interest in the funds loaned to Defendants that remain unpaid.

64. The Defendants have wrongfully converted Plaintiff's property (i.e. funds) for their own benefit and without the consent of Plaintiff or any legal justification.

65. As a direct and proximate result of Defendants' wrongful acts, Plaintiff has incurred damages in excess of $1.8 million.

WHEREFORE, Plaintiff, Michael Kuchmek, respectfully requests that this Court enter judgment in his favor and against Defendants Marat Tsirelson, Igor Shrayev, IREIT, LLC, IREIT, Inc., GM Home, Inc., and GMA Realty Network, Inc. for direct damages in excess of $1,800,000.00, consequential damages, punitive damages and such other relief as the Court deems just and equitable.

David L. Hall
Richard D. Gallucci, Jr.

WIGGIN AND DANA LLP
50 S. 16th Street
Two Liberty Place, Suite 2925
Philadelphia PA 19101

P: 215-988-8325
F: 215-988-8344
dhall@wiggin.com
rgallucci@wiggin.com

Attorneys for Plaintiff
Michael Kuchmek

Dated: May 17, 2017.

26498\1\3684573.v1